The court would like to call case number 118143, Alma Vey v. M.L.K. Enterprises, L.L.C. Are you ready to proceed, counsel? Good morning. Good morning. My name is John Daly. I'm the Associate General Counsel for Southern Illinois Hospital Services, who is the appellant in this matter. In November of 2010, I stood in this exact same position arguing the Winling case, wherein this court found that the Common Fund Doctrine does not apply to health care professionals and providers under the Health Care Services Lien Act. Two years later, the Fifth District, in the Stanton decision, acknowledged that the Winling decision prevented the Common Fund Doctrine from being applied to health care lien holders, but determined that under statutory construction rules, that it would allow the attorney's fees to be shifted over to the health care lien holders. But it said that Winling did not apply because that case only dealt with the Common Fund Doctrine and did not look at the statute in making that determination. In July of last year, the Fifth District again stated in McVey, which is why we're here today, that the decision in Stanton would apply to the McVey case. It is our position, and that of the First District Appellate Courts, in the case of Wolf v. Tooley, which was recently decided and issued, that the Fifth District erred in its decision. In looking at the Fifth District case of McVey and Stanton, which they're both basically the same, the Court looked at statutory construction. Under statutory construction, the primary objective is to ascertain and give effect to the intent of the legislature. The most reliable indication of such intent is the actual language of the statute, which is to be given at plain and ordinary meeting. Courts should not read limitations into a statute that the legislature did not originally include. When the statute is clear and unambiguous under the plain language of the statute, there is no reason for the courts to search for motives of the legislator to justify the statute giving a different meaning than the words that are actually written. They should not rewrite statutes to make them consistent with the Court's idea of orderliness and public policy. In this case, if you look at the statute, it's very clear and unambiguous under the plain language of it. It simply states, it starts, if you have a settlement and there are lien holders in that settlement, if you multiply the settlement times 40 percent, or settlement, verdict, award, compromise, or judgment, you multiply that times 40 percent. If the lien holders have liens equal or exceeding that 40 percent, then the Health Care Lien Act applies. If they do not, then it does not. If it does apply, then you take that gross settlement, verdict, judgment, award, or compromise, and multiply it times 40 percent, and that is what is given to the health care lien holders. You then take 30 percent and give that to the attorney, the plaintiff's attorney, and any balance remaining is given to the plaintiff. What Stanton did was they went through that formula and then decided that the legislature intended that the plaintiff get 30 percent, which makes sense, but that's where they started. They said, okay, the legislature wants to give the plaintiff 30 percent in this case. Therefore, in order for them to get 30 percent, we need to take the attorney's fees out of the settlement first and include the costs and expenses. Then we would apply 40 percent for the lien holders. For example, if you have a $100,000 settlement and let's say there's $10,000 in costs and expenses, you would take out $40,000, which is the 30 percent to the attorney, and the $10,000 in costs, which would leave you $60,000. They would then apply the 40 percent to the 60, giving the lien holders, what, $24,000. So instead of getting $40,000, which is what the statute provides, they've now reduced the lien holder's percentage to $24,000, which is 24 percent. This is even worse than applying the common fund doctrine.  Isn't it also true, counsel, that because the inclusion of costs, doesn't the calculation at times come out where the plaintiff gets less money as a result? Yes, depending on the costs. But the problem with what the Fifth District did is they didn't even pay any attention to the Attorney's Lien Act. If you look at the Attorney's Lien Act, it specifically sets forth that the Attorney's Lien includes its fees plus costs and expenses. And we had tried to argue that in the McVeigh decision, that the Attorney's Lien Act would control here, and they paid no attention to it whatsoever. I mean, if you look at the opinions in both Stanton and McVeigh, the Attorney's Lien Act is not mentioned. But if you look at the First District case in Wolf v. Tooley, they specifically state that the Attorney's Lien Act provides that the lien for the attorney includes costs and expenses, so they're limited to 30 percent. In addition, the Attorney's Lien Act also specifically references the Health Care Services Lien Act, saying that if the Health Care Services Lien Act applies, then the attorney's lien is going to be limited to 30 percent. This would include costs and expenses. So if you apply that to the Health Care Lien Act, the plaintiff is always going to get 30 percent, which is exactly what the statute says. So you have 40 percent to the lien holder, 30 percent to the attorney, and then 30 percent to the plaintiff. So right back- What happens if the issue seems to be who bears the costs, and you're suggesting that that is included in the 30 percent that is anticipated in the statute? That is correct. What happens if the agreement between the client and the attorney is that the client bears the costs? What happens then? That's not relevant to the statute. The statute sets forth what the attorney gets. We're talking about the lien. My question to you is, does the attorney have an action, a cause of action against the client? Sure, but he would not have a lien against the settlement. He would have a contractual-he would have a contract with the plaintiff that he's to get his costs back. Now, what they do between them is up to them, because under my lien, I'm only going to get 40 percent. Or if I'm the only lien holder, I'm limited to one-third under the statute. So any balance left over, I could try and collect it. In reality, we may collect 10 percent, if that. Most of the time it's written off to bad debt. So I may have a $100,000 bill or lien, and if the settlement is only $100,000, if I'm the only lien holder, I'm going to get $33,000. The remaining balance is $67,000. Yeah, I could try and collect it, but most times you can't. I mean, in most situations when we're dealing with motor vehicle accidents and this type of amounts, they don't have health insurance. A lot of the times they're on Medicaid, and it would be a waste of time to collect it. So it's written off to bad debt, which increases the bad debt of the hospitals all over the state. But similarly, the attorney would be in the same position. Correct. Correct, they would be in the same position. But, you know, maybe that would prevent the attorney from raising the cost to litigate the case, or maybe they shouldn't have taken the case in the first place if it wasn't worth that. You know, I can't make that decision for them. That's up to the attorney and up to the plaintiff. I can only tell you we gave them medical services for which we have a bill and which we have a lien, and the statute provides that we are to get 40 percent of the gross verdict, settlement, award, compromise. It doesn't state that we get 40 percent of that settlement after attorney's fees. I have nothing to do with the attorney. And that's kind of what the Common Fund Doctrine back in Wendling said, that we have a debtor-creditor relationship with the patient, and the Common Fund Doctrine would not apply because the attorney's not working for us. We're separate from that case. We can't intervene in that case, and therefore they can't get paid out of our 40 percent. If you look at the legislative intent, and, you know, if you find that the language is not clear and unambiguous and you want to go to legislative intent, well, you look back at the congressional record and the debates that they had. If you look at that, they simply state in there that we are going to, and it goes back to 2003 when the statute first came in. There was an agreement had between the Illinois Trial Lawyers Association, the State Medical Society, and the Illinois Hospital Association. We had a problem back then where you had eight different lien statutes, and there was a case where because of those statutes, and there was no limitation, the plaintiff ended up with nothing. So they thought that was wrong. So let's fix that. The way they fixed it was they came up with an agreement, and with this formula they put in the statute. And they said, okay, we'll give 40 percent to the lien holders, we'll give 30 percent to the attorney, and the balance goes to the plaintiff. That was the intent for the statute. That was the reason they put the statute in, because you had a plaintiff getting nothing. The fact that the attorney in the Stanton case had so much in expenses had nothing to do with the intent of the legislature. They said the attorney gets 30 percent. That includes their costs and expenses. And it's interesting to note the Attorney's Lien Act has been around since 1990. That portion of it, plus costs and expenses, has been there for over 20 years. But the only time it's come up that I know of is in this case, where the attorney ran up costs and expenses and maybe had to spend that. I don't know. But he's only entitled to 30 percent under both of the statutes. First District agreed with this. They said our reading of the statute, the plain language of the statute, states that lien holders get 40, attorney gets 30, and the costs and expenses are included in that 30. So if you look at the plain language of the statute, it's very clear. I don't see any ambiguity, and I don't see any reason to go outside of the statute itself. If there's no further questions. Thank you. May it please the Court. I'm Daryl Dunham. I'm representing Alma McVeigh. And I represented her when she came into my office because she had some lacerations on her foot. I had no idea, couldn't have predicted, that her case was going to wind up in the Illinois Supreme Court. And I've got an additional high standard because the Chief Justice has already said my argument is going to be wonderful. And I also, I don't deal in such rarefied errors, Mr. Daly. He starts at $100,000, but, you know, McVeigh's case was $7,500. And I like to use the math, let's just start at $10,000. And so they say it's a very simple case. And if you've got multiple liens, the medical provider's going to get $4,000, I'm going to get $3,000, client's going to get $3,000. But as the court is appropriately centered on, what do we do in the case where the costs are $3,000? And that's exactly what happened in Stanton. And I gave a list of Westlaw jury verdicts. I couldn't find anything about settlements in the literature anywhere, but at least when I'm advising my client whether to settle a case, we try to prognosticate, well, what do we think a reasonable jury is going to do? And so I think it's not an unfair assumption to believe that the settlements are going to pretty well mirror the jury verdicts. Now, under their solution, I suppose, if I'm reading the briefs correctly, they're going to get their 40%, which is $4,000. My client is going to get $3,000. And I'm going to get absolutely nothing for my time because I've got to recapture those costs. But as this court indicated in the Winley case, the medical providers would have a cause of action back against the client for any sums that weren't paid under the lien. Now, I admire the candor here. Mr. Daly is saying, well, practically speaking, that's not going to happen at all. But that was the theoretical basis for Winley, and I understand that. And in Winley, this court, I thought, did a very thorough job analyzing the case law in other jurisdictions and saying the common fund did not apply in other jurisdictions and you just weren't going to do it here. And I understand why, and that makes a lot of sense. But if the medical providers can go against the client for the excess fees, I suppose I can as well. Now, I don't know, under this statute, I don't know that I have a lien on the settlement proceeds, the $7,500 after the medical provider has been paid. In this case, it's going to be essentially $6,000. But I do have a contractual right. I suppose I could set it off and I could say thank you very much for your time and energy, client, but given the way that the costs break out in your agreement to reimburse me for my costs, you get absolutely nothing at all. Go ahead. What language in the Act supports the Stanton's conclusion that attorney's fees and costs are to be deducted first? When you say the Act, Your Honor, are you talking about the Health Care Act or the Attorney Wing Act? Yeah, the Health Care Act. Okay. The answer is there's no expressed language in the Act that provides that. And I make an argument in the brief that the literal construction shouldn't necessarily apply in this case because what happened is, in the first district case, is they took the definition of costs in the Attorney Wing Act and then grafted it. It does say attorney liens, but it doesn't say in the Health Care Act, it doesn't specifically say costs, but they take the definition of costs in the Attorney Wing Act and say, well, they embrace that definition and so therefore it has to apply under the Health Care Wing Act. The point is that that Attorney Wing Act has been there for years. I mean, it's been essentially in the same form before I even started practicing law. And by putting the cost in favor of the attorney, that was supposed to benefit the attorney. That was the reason why it was in there. The attorney not only gets paid for his time and energy or her time and energy, but also gets the deposition cost, the filing fees, other costs of the case. But now what's happened here, of course, it's been juxtaposed, and the attorney is being penalized for those costs. How about the real world, Mr. Dunham? I understand and can empathize with your example where the attorney gets nothing on the $10,000. But the plaintiff's attorney in most, if not every aspect, says, if we don't recover, you pay nothing. That includes eating the costs in those cases. So if you take in a client and it doesn't settle and you go to verdict and the verdict is for the defendant, you eat those costs. I do. You don't get paid for your time. You don't get paid for your costs. So you come up with this small settlement, relatively small settlement of $10,000. The hospital never cut that kind of deal with the plaintiff in the case. Although I empathize, if someone is going to be cut out in that small settlement situation, isn't it something the attorney took on from the get-go? And that is what the suggestion was made by Mr. Daley. I think he was referring to me when he said, probably I shouldn't have even brought the lawsuit in the first place. I think he was talking in general. But I can see how you might take it personally. No, no, I've known him for years. He gives me a bad time. I've known him all the way back to law school. So we have that kind of relationship. If I have a chance to take a jab at him, I might. But here's the point. If you look at the settlement, the Westlaw settlement, I just went back to city settlements, the simple fact of the matter is, and I think we have to be realistic about this, because I don't even think we are in the real world. Let's assume in this particular case, probably what I'm going to do, if you wind up reversing, I'm going to sit down with McVeigh, I'm going to explain the reality, and I will probably maybe split the cost with her or absorb most of them myself. If that's the situation now, as he admits, I'm never going to bring this suit. Now, who is rewarded by that? McVeigh is not going to be rewarded because she's going to get no money at all. I'm not going to be rewarded because I'm not bringing the suit. The health care providers, they're not going to be rewarded because there's going to be no fund from which they're going to collect any money. And Mr. Daley just admitted that they don't bring those suits. They write 90% of them off as a business debt. So the only person that gets rewarded is the tort fees. Now, I submit, I think that's an absurd and unreasonable result. Mr. Dunham, if we believe that the language of the statute is clear, taking the reference in the Health Care Act to the attorney's lien and look at the attorney's lien, and we believe that it's clear that the lien includes attorney's fees and costs, how do we get to these policy issues that you're talking about? I'm glad that you were the one that asked that question because yesterday I reread what I thought was a very fine opinion, written by you, of course, in the Wilson case. And you, along with a majority of your fellow brethren and sisters here on the court, said on occasion, where the statute yields absurd, unreasonable results, we just can't go with the literal construction of the statute. And in this case, Stanton is a beautiful example of that. We have a legislative history. The legislative history says, does it? Now, we have the Senate saying we want to get enough money to the plaintiff so that the plaintiff will have an incentive to settle. Now, whether ethically I can load all the costs on the plaintiff or I have to absorb them myself, we find ourselves in a situation where we're going to have cases tried because the plaintiff or the plaintiff's attorney, or a combination thereof, have nothing to lose but to try the case. Is the statute absurd in every circumstance? It is not, Your Honor. And I give you that one case where the settlement was, I think, several million dollars. It's difficult to see in most of those kinds of large settlement cases where the costs are going to influence the decision to settle. But in this case, in the estate of Wilson, the suggestion was, in the actual language of the case, is that some unscrupulous litigants could abuse the statute in terms of the substitution of the judge and unfairly delay the litigation. That's what this court ruled, and certainly it's implicit in that opinion that not every litigant that's trying to substitute out a judge is going to abuse the statute that way. But the fact is, the fact that some litigants could abuse it that way and bog down the litigation caused this court to not opt for the literal construction of the statute. The literal construction of the statute said, whenever a litigant said, wanted to file a motion to substitute out a judge for alleged bias, the statute specifically said, on its face, everything has to stop. Another judge has to take a look at that and decide whether the substitution of judge has any merit. And this court said the legislature could not have meant that given one litigant that much power and basically refused to apply the statute literally. And I don't think that the Stanton case is just an outlier. I don't think that's the one case in 100 or one case in 10,000. But look at the jury verdicts that I put out in my, set out in my brief here. We have a situation where virtually all of the verdicts where they actually went to verdict and plaintiff got some money, they're kind of in the Stanton-McVeigh range where the costs are going to be a significant factor in how that money's divvied up. What about the Wolf case? What can I say? Obviously what the Wolf case decided, it rejected the reasoning of Stanton. It was aware of Stanton, rejected Stanton, and said, look, we feel that Wendling is controlling. Essentially what the plaintiff was asking for was some form of the common fund doctrine as the first district was reading it and felt like Wendling was controlling. In fact, that's what the trial judge did in this case. When we started this at the very beginning, I thought I went into the courthouse and I said, well, we got Stanton here, I'm going to win this one anyway. And Mr. Daly's co-counsel said, well, Wendling here, and the trial judge said, well, Wendling controls. I'm not even going to follow Stanton. But the simple fact of the matter is that this court itself in Wendling did not engage in a statutory analysis of what this statute meant. What this court said in Wendling was the common fund doctrine doesn't apply. And you didn't really parse the statute. In fact, you didn't even in Wendling come out with an analysis of how much money the plaintiff was going to get and how much to the health care providers and how much to the attorney. You engaged in none of that analysis. So I think Stanton was perfectly within its parameter. I don't think it was refusing to follow Wendling by looking at the statute and trying to come up with some kind of result that wouldn't lead to these unreasonable, absurd results. The simple fact of the matter is, if I go back to my hypothetical, 10,000, 4,000 medical providers, 3,000 to a client, 3,000 to me, but we've got 3,000 in costs. Well, let's just assume I split it with the client. Because practically, you can't have the client leave your office with nothing. You're absolutely right. I'm not going to do that. So maybe Alma's going to be satisfied with $1,500. She's actually a personal friend of mine, and so we trade favors all the time, so maybe she would. But in the practical case, but I'm not going to bring the suit. I'm not going to bring the suit. And who wins? The tort fees. If we agree with you, would we have to overrule Wolf? If we agree with you, would we have to overrule the Wolf decision? I'm pausing because I'm trying to – I would say practically speaking, yes, you probably would. But you could do it for reasons that Wolf did not take up. As I'm reviewing the Wolf case in my mind, I don't think this absurd result, unreasonable result analysis, was embraced in any significant detail in that case, if at all. And I don't know if Wolf is not on review here, but you certainly could, in your opinion, suggest that Wolf and others like it be reviewed with your analysis in mind in future cases. Just in closing, Stanton is not an outlier. My case in McVeigh is not an outlier. The overwhelming majority of these settlements are not the 100,000 range that Mr. Daley is used to dealing with. It's more the 7,500, the 15,000, the 10,000 that I'm used to dealing with. And if you just load all those costs onto either the client or to the attorney or have them split it in one way, you're not getting – the legislative history says 40% healthcare providers, 30% attorney, 30% client. You're not getting that. You won't get it. And you won't even come close to it. If there aren't any further questions, thank you. I hope my argument was wonderful. Thank you. I wish I was used to dealing with the $100,000 settlements. Unfortunately, most of them are in the 10, 15, 20, 20, $5,000 range. Otherwise, we wouldn't be in court dealing with a petition to adjudicate the lien. A couple of things. I think the point brought up that the attorney is taking the risk when they bring the case. If you want to look at absurd results, what happens if the judgment in McVeigh had been $1,000? Then we go 30% for the attorney. Well, then he's still going to be out a ton of money. So what is the difference between that and a $7,500 settlement? You've still got his supposed absurd results. But that was what the case was worth or what the jury decided or what the settlement was or what the maximum amount of insurance. And one of the biggest problems we have with these liens is that the insurance most of the time is the minimum amount. And you can't even go to the ER and spend a night in the hospital without spending $10,000. Unfortunately, that's the case. Do one MRI, it's $5,000. I wish it were less. If it were less, we wouldn't be here dealing with these liens. So, yeah, maybe the tortfeasor is being rewarded, but that's part of dealing with the legal system. Maybe the liability wasn't there. Maybe there was no liability, and they're just settling the case to get rid of it. I'm sure that happens many times. So what McVeigh wants you to do in this case is rewrite the statute. And that is the forum of the legislature, not the forum of the court. In order to get to the results that he wants in this case, you would have to rewrite it, so state that the plaintiff receives 30%, the attorney receives 30% plus his costs, and then the health care provider gets whatever's left over. Only in their case, in Stanton's case, that's not even true either, because the attorney is going to get his money plus his costs. We're going to get 40% after that, and then the plaintiff is going to get the rest. So many times the plaintiff is going to receive more than 30%. That's not what the statute says. We have to go with what the legislature put in the plain language of the Act, and that is that lien holders get 40% of the verdict, settlement, award, judgment, or compromise, the attorney gets 30%, and the plaintiff gets the balance. I don't see any other way of interpreting that without rewriting it, which is, in my opinion, what the Fifth District did in this case. In answer to your earlier question, in order to go with the Stanton formula, you would absolutely have to overrule Wolfe. They're the same case. The same decisions were made in them. They just came out on opposite sides of the issue. So I don't see how you can affirm Stanton McVeigh without overruling the Wolfe v. Tooling case in the First District. Thank you. Thank you. Case number 118143, Alma McVeigh v. MLK Enterprises, LLC, will be taken under advisement as agenda number 11. Mr. Daley and Mr. Dunham, we thank you for your arguments. I'm sure the students found them to be very beneficial and entertaining, and we appreciate you arguing your case before them and before us. And you're excused at this time. Martial, the Supreme Court stands adjourned.